**LEO GOODWIN INSTITUTE FOR CANCER RESEARCH, INC.,**
Appellant,

v.

**UNITED STATES, Appellee.**

**Commerce Appeal No. 4.**

United States Court of Customs and Patent Appeals.

Sept. 4, 1975.

John C. Doerfer, pro se (Leo Goodwin Institute), for appellant.

Irving Jaffe, Acting Asst. Atty. Gen., William Kanter and Mark N. Mutterperl, Washington, D. C., for the United States.

Before MARKEY, Chief Judge, BALDWIN, LANE and MILLER, Judges, and ALMOND, Senior Judge.

ALMOND, Senior Judge.

The Leo Goodwin Institute for Cancer Research, Inc. (appellant) appeals from a decision of the Secretary of Commerce[1] denying its application for duty-free entry of an electron microscope pursuant to item 851.60, Tariff Schedules of the United States[2] under section 6 of the Educational, Scientific and Cultural Materials Importation Act of 1966.[3] The institution has already placed a bona fide order for the instrument or apparatus or has a firm intention, in the event of favorable action on its application, to place such an order on or before the final day specified in paragraph (d) of this headnote for the placing of an order. If the application is made in accordance with the applicable regulations, the Secretary of the Treasury shall promptly forward copies thereof to the Secretary of Commerce and to the Secretary of Health, Education, and Welfare. * * *

(c) Upon receipt of the application the Secretary of Commerce shall, by publication in the Federal Register, afford interested persons and other Government agencies reasonable opportunity to present their views with respect to the question whether an instrument or apparatus of equivalent scientific value for the purposes for which the article is intended to be used is being manufactured in the United States. After considering any views presented pursuant to this paragraph, including any written advice from the Secretary of Health, Education, and Welfare, the Secretary of Commerce shall determine whether an instrument or apparatus of equivalent scientific value to such article, for the purposes for which the instrument or apparatus is intended to be used, is being manufactured in the United States. Each finding by the Secretary of Commerce under this paragraph shall be promptly reported to the Secretary of the Treasury and to the applicant institution. Each such finding shall be published in the Federal Register, with a statement of the reasons therefor, on or before the ninetieth day following the date on which the application was made to the Secretary of the Treasury in accordance with applicable regulations.

* * * * * *

(e) Within 20 days after the publication in the Federal Register of a finding by the Secretary of Commerce under paragraph (c) of this headnote, an appeal may be taken from

1. The notice of the decision is signed by the Director, Special Import Programs Division, Domestic and International Business Administration, Department of Commerce.

2. Item 851.60 reads:

Articles entered for the use of any nonprofit institution, whether public or private, established for educational or scientific purposes:

851.60    Instruments and apparatus, if no instrument or apparatus of equivalent scientific value for the purposes for which the instrument or apparatus is intended to be used is being manufactured in the United States (see headnote 6 to this part [footnote 3, infra]) ............ Free

3. 80 Stat. 897, 19 U.S.C. § 1202, Schedule 8, Part 4, Headnote 6. The Act provided the implementing legislation necessary for the United States to become a party to the Agreement on the Importation of Educational, Scientific and Cultural Materials. This agreement, signed by the United States on June 24, 1959, was sponsored by the United Nations Educational, Scientific and Cultural Organization and was designed to facilitate the free flow of educational, scientific and cultural materials by allowing their duty-free importation. S.Rep.No.1678, 89th Cong., 2d Sess. 1 (1966), U.S.Code Cong. & Admin.News, 1966, p. 3254.

The pertinent portions of Headnote 6 state:

6. * * *

(b) An institution desiring to enter an article under item 851.60 shall make application therefor to the Secretary of the Treasury including therein (in addition to such other information as may be prescribed by regulation) a description of the article, the purposes for which the instrument or apparatus is intended to be used, the basis for the institution's belief that no instrument or apparatus of equivalent scientific value for such purposes is being manufactured in the United States, and a statement that either the

basis for the denial was the finding that "[a]n instrument or apparatus of equivalent scientific value to the foreign article, for such purposes as this article is intended to be used, is being manufactured in the United States." We affirm.

Appellant filed its first application for duty-free entry of a previously ordered electron microscope on October 2, 1972.[4] The microscope, a Philips EM–201, manufactured in Holland by Philips Electronics Instruments Company, was to be used in connection with investigations to be conducted on the nature of malignant diseases, as well as to train graduate and post-graduate students. The application asserted:

[T]here is no electron microscope currently manufactured in the United States which is capable of performing the same function as the Philips 201 instrument. * * * RCA no longer manufactures electron microscopes, and it is our understanding that * * the Forgflo Corporation purchased the RCA designs, manufactured one or two instruments, but that these are no longer on the market.

Describing appellant's efforts to ascertain the availability of a domestic instrument or apparatus of equivalent scientific value to the foreign articles, the application continued:

We have contacted Forgflo Corporation by telephone regarding the availability of an instrument and the delivery time and were informed that although the company intended to resume production of their electron microscope, neither a cost, delivery date or adequate description were available at this time. Based on information from American experts in the field of electron microscopy, the Forgflo Corporation is on the verge of bankruptcy

and can be disregarded as a factor in the manufacture of electron optics.

A notice of the application was published in the Federal Register [5] as required by the statute, and a letter, dated February 14, 1973, was thereafter received from Forgflo's chief engineer in the electron microscope division, which provided in pertinent part:

I wish to assure you that Forgflo Corporation is currently engaged in the manufacture and sale of the EMU4 Series Transmission Electron Microscope and that we have been so engaged, on a continuous and uninterrupted basis, since July of 1969.

Evidencing its continued operations, Forgflo also submitted literature describing its EMU–4 electron microscope and copies of correspondence with potential customers bearing dates ranging from January 26, 1972 to January 9, 1973.

On March 30, 1973, after reviewing the application, the National Institute of Health's Florence Agreement Committee, acting under delegation from the Secretary of Health, Education and Welfare, recommended that it be denied without prejudice to its resubmission because "[t]he description of the research or teaching is not given in adequate detail to establish pertinent characteristics for the article." The Committee further commented that "[t]he domestic EMU–4C was being offered for sale when the article was ordered. The application does not clearly show this instrument to be inadequate for the research work or the teaching described." On April 11, 1973, appellant's application was denied without prejudice.

A second application for the same article was submitted on July 9, 1973. The application asserted, inter alia, "[t]he

---

said finding *only upon a question or questions of law* and only to the United States Court of Customs and Patent Appeals—

\* \* \* \* \* \*

(i) by the institution which made the application under paragraph (b) of this headnote. [Emphasis supplied.]

4. Appellant previously informally notified the Office of Import Programs by letter, dated August 17, 1972, of its intent to import a foreign manufactured electron microscope. This letter corresponded in substance with the subsequent formal application.

5. 37 Fed.Reg. 22759.

overriding consideration for the Philips EM–201 is its relative simplicity of design and ease of operation on a daily basis." The application further stated:

We have been informed that the company (Forgflo Corporation) is bankrupt but that the RCA Corporation will continue to service their instruments on a parts-available basis. Inasmuch as there are several Philips instruments in South Florida, prompt and economic service is available in comparison to servicing of the RCA EMU–4C.

Notification of the second application was thereafter published in the Federal Register,[6] and the Florence Agreement Committee, again citing an insufficient description, recommended denial without prejudice. The Committee also noted, as it had previously, that domestic instruments, including the EMU–4C, had not been shown to be scientifically inadequate for the intended purpose. This second application was denied without prejudice on November 16, 1973.

A third and final application was filed on February 20, 1974, reciting ten factors, shown below in tabular form as they appear in the application, which were asserted to be necessary for the intended uses of the Philips instrument and which were further alleged to be lacking in the domestically manufactured unit.

|  |  | Philips EM 201 | RCA EMU–4C | Remarks |
|---|---|---|---|---|
| 1. | Designed | 1971 | 1965 | No significant modernization of the essentially obsolete EMU–4C is likely. Available models have some components 5–10 years old. |
| 2. | Solid State Circuitry | Complete | Mostly vacuum tube | Maintenance of vacuum tube circuitry is increasingly difficult. |
| 3. | Heat Load | Negligible | Considerable | Our available lab space for microscope is 6 x 8 feet. |
| 4. | Space Requirement | 1240 x 870 mm | 1796 x 1588 mm |  |
| 5. | Auxiliary Cabinet | No | Yes, for pump |  |
| 6. | Cameras | 35 mm and plate | Plate only | Students can take essentially unlimited photographs. |
| 7. | Magnification Read-out | Digital | Dial calculated | Much less chance of errors in plate magnification. |
| 8. | Excentric Goniometric Stage | Available | Not available | Anticipate purchase of stage for specimen tilting. |
| 9. | Resolution | >5 Angstrom | 8 Angstrom (Cat. #EM303) | There is no operating RCA electron microscope in South Florida. Claims |

6. 38 Fed.Reg. 21287.

| | Philips EM 201 | RCA EMU–4C | Remarks |
|---|---|---|---|
| 10. Power Description | 3.0 KW | 4.0 KW | of resolution are only meaningful in relation to experienced and trained microscopists and senior personnel. The EMU–4C scope at the University of Puerto Rico has an attainable resolution of >25 Angstroms. |

As further justification for duty-free entry, the application asserted:

At the time that we ordered the Philips EM 201 (August 1972), there was only one domestic competitive electron microscope on the market, the EMU–4 formerly manufactured by RCA. * * *

\* \* \* \* \* \*

* * * [The Forgflo Corporation] was unable to furnish either a guarantee of adequate service or any evidence that the RCA scope would be up-graded or further developed under their direction. Based on information from U.S. experts in electron microscopy, the Forgflo Corporation was on the verge of bankruptcy and any guarantee of their backing up the RCA unit were [sic] highly suspect.

Notification of the application was published in the Federal Register[7] on April 12, 1974, and on May 24, 1974 the Florence Agreement Committee once again recommended its denial on the ground that "the description of the research or teaching does not establish a pertinent characteristic for the article that upholds duty-free entry." The Committee further commented:

Anticipated service needs and other cost related items, or the wisdom of purchase decisions are not relevant to duty-free entry; nor is [sic] Laboratory Space size, photograph or other conveniences. The domestic EMU–4C has a tilt stage, other cameras are available and guarantees 5 Angstrom resolution.

Additionally, Forgflo's treasurer submitted a letter dated August 9, 1974, which stated:

From the time the Scientific Instrument Division of RCA was acquired by Forgflo [in 1969] until the date of sale by Forgflo Corporation to Adam David Company (completed on May 17, 1974), the EMU–4 Electron Microscopes of various model types were continuously being marketed in the United States and abroad.

It was determined by the Secretary of Commerce, in a decision,[8] dated August 30, 1974, denying appellant's final application, that "[a]n instrument or apparatus of equivalent scientific value to the foreign article, for such purposes as this article is intended to be used, is being manufactured in the United States." The Secretary, relying on the Florence Agreement Committee's recommendation, further commented:

The Department of Health, Education and Welfare (HEW) reviewed this application and compared the alleged pertinent features of the article with those of the most closely comparable domestic electron microscope, the Model EMU–4C, formerly manufactured by Forgflo and now supplied by the Adam David Company. HEW advised in its Memorandum dated May 24, 1974, that the cameras and 5 Angstroms resolution features (8) and (9), are available in the EMU–4C and that features (1) through (7), above, are convenience features, none of which constitutes a "pertinent specification" within the meaning of Section 701.2(n)

---

**7.** 39 Fed.Reg. 13294.

**8.** 39 Fed.Reg. 32340.

of the regulations. Feature (10) was not ordered with the article and therefore cannot be considered in the determination of scientific equivalency according to Section 701.2(d) and 701.-6(a)(3) of the regulations. Appellant has appealed from this decision.

■ This court has jurisdiction on appeal, as specified in 28 U.S.C. § 1544, to review the findings of the Secretary of Commerce relating to the importation of scientific instruments or apparatus. The scope of our review is limited to "questions of law only," and this language has been construed to mean that review "is limited to determining whether the administrative decision is supported by substantial evidence." *Varian Associates v. United States,* 56 CCPA 54, 57 (1969).

Appellant asserts in this appeal that the Secretary erred as a matter of law in failing to consider normal commercial practices applicable to the production and delivery of instruments or apparatus of the same general category as the domestically manufactured EMU–4C, as required by Chapter VII, Section 701.11(b) of the Rules and Regulations of the Office of Import Programs, Department of Commerce, 15 C.F.R. 701.11(b).[9]

■ Forgflo's financial circumstances, appellant contends, made it impossible for the company to furnish an adequate guarantee of service for its instrument. The Government's position is that the only "normal commercial practices" that the Secretary of Commerce is bound to consider are those which pertain to "production and delivery," not to "financial stability and reliability of service requirements."[10] Whether, as a matter of law, the availability of servicing bears on the issue of the scientific equivalency of the apparatus or whether it is simply a commercial consideration which need not be considered, it is clear, at least to the majority, that servicing was available for Forgflo's products at the time of appellant's purchase of the Philips EM 201. Substantial evidence supportive of the Government's position appears in the record in the form of a letter, dated December 10, 1973, from J. J. Astl of the RCA Service Company, the authenticity of which has not been challenged. This letter states:

> Statements made by individuals or organizations which in effect imply RCA Service Company no longer is interested in Electron Microscope service, are totally unfounded.

> RCA Service Company will provide service and parts to any individual or organization in the U.S.A. and Hawaii. *We know of no instance where service has been refused to anyone, with the*

---

**9.** Electron microscopes have been held to be within a category of instruments or apparatus that is produced on order. Decision of the Director on Application of Purdue University for Duty-free Entry of Scientific Article, Fed. Reg., Vol. 37, No. 209, October 21, 1972.

Chapter VII, Section 701.11(b) of the Rules and Regulations of the Office of Import Programs, Department of Commerce, pertaining to instruments that are produced on order, provides, inter alia:

In determining whether a U.S. manufacturer is able and willing to produce * * * on order or custom-made instrument, apparatus or accessory and have it available without unreasonable delay to the applicant the Deputy Assistant Secretary shall take into account the normal commercial practices applicable to the production and delivery of instruments, apparatus or accessories of the same general category. 15 C.F.R. 701.11(b).

**10.** The kinds of "normal commercial practices" contemplated by the regulations are set forth at 15 C.F.R. 701.11(b), which provides, inter alia:

For example, * * * [the Secretary] may take into account the production experiences of the domestic manufacturer with respect to the types and complexity of products, the extent of the technological gap between the instrument, apparatus, or accessory to which the application relates and the manufacturer's customary products, and the availability of the professional and technical skills, as well as manufacturing experience, essential to bridging the gap and the time required by the domestic manufacturer to produce an instrument, apparatus, or accessory to purchaser's specifications.

*exception of credit suspensions for failure to pay invoices due.* [Emphasis added.]

In view of the emphasized last sentence of this letter which has gone uncontradicted by any evidence submitted by appellant, we think the date of this letter, which is more than a year after appellant ordered the Philips instrument, does not render it any less effective as "substantial evidence" that servicing was available during the relevant time period.

We note further that the applicable regulations specifically exclude from the Secretary's consideration, for instance, "such characteristics [of the instrument] as size, durability, complexity, ease of operation, ease of maintenance and versatility, unless the applicant can demonstrate that they are necessary for accomplishing the purposes for which the article is intended to be used." Section 701.-2(n). Also specifically excluded is difference in cost between the domestic and foreign instrument. Section 701.2(n).

■ We are also convinced that substantial evidence supports the Secretary's factual determinations that the EMU–4C was being manufactured in the United States when appellant purchased the foreign microscope and that the EMU–4C is of equivalent scientific value to the foreign instrument for such purposes as the instrument was intended to be used.[11]

Forgflo's letter of record dated February 14, 1973, confirming an earlier telephone conversation, clearly states that it was then currently engaged in the manufacture and sale of the EMU–4C and that it had been "so engaged, on a continuous and uninterrupted basis, since July of 1969." Evidencing its continuing operations were correspondence with potential customers during the relevant periods of time and some technical literature which describes the EMU–4C electron microscope. Appellant asserts, however, "that the Forgflo Corporation was not a viable company at and immediately prior to the time (August 17, 1972) the appellant negotiated a purchase of the Philips EM 201 electron microscope," citing, inter alia, the Tariff Commission's Report to the President of the United States.[12]

Our review of the Commission's report, however, leads us to a different conclusion. The report states that Forgflo's sales of the EMU–4C were disappointing, resulting in its inability to complete development of its new "Paragon" model, a prototype of which had been made in October 1970. The report provides no indication of whether the older EMU–4C model was being manufactured in the United States by Forgflo during the summer of 1972, but indicates that Forgflo did have an existing inventory of EMU–4C electron microscopes, out of which appellant's order could presumably have been filled. Neither this nor any of appellant's other evidence contradicts the statement of Forgflo's chief engineer that Forgflo was engaged in the manufacture of the EMU–4C during the relevant time period. The logic of appellant's further allegation that Forgflo was "not actively manufacturing parts" and could not therefore have been manufacturing completed units during the summer of 1972 completely escapes us. Certainly, the fact that a domestic manufacturer of an article is assembling completed units from parts in its inventory, which it has previously manufac-

---

**11.** In this context, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Brooks Paper Co. v. United States,* 40 CCPA 38, C.A.D. 495 (1952). This has been taken to mean that the findings of the tribunal will not be disturbed even if such findings are "clearly contrary to the weight of the evidence" so long as there is "any substantial evidence" in support of those findings. *A Zerkowitz & Co. v. United States,* 435 F.2d 576, 581, 58 CCPA 60, 66 (1970) and cases cited therein.

**12.** Tariff Commission Publication 487, Washington, D. C., May 1972.

tured or purchased elsewhere, should be sufficient to support the conclusion of the Secretary of Commerce that an instrument of equivalent scientific value was being manufactured in the United States during the relevant time period.

The Secretary's finding of scientific equivalency, which relied on the report of NIH's Florence Agreement Committee, is also amply supported by the record. The features sought to be relied upon were not considered by the Secretary in the abstract. Rather, they were considered in connection with the purposes for which the article was intended to be used. This was a judgmental determination made on the basis of a report from a committee with a particular expertise in the field, and the Secretary correctly considered this advice along with the rest of the evidence.

Accordingly, the decision of the Secretary of Commerce denying appellant's application for duty-free entry is *affirmed.*

*Affirmed.*

MILLER, Judge (dissenting).

In holding that the Secretary's finding of scientific equivalency is "amply supported by the record," the majority appears to have directed its attention exclusively to the research purpose for which the Philips EM 201 microscope was intended to be used and to have ignored the other major purpose of use in training graduate and post-graduate students in basic principles of electron microscopy. Appellant declared in its first application, filed October 2, 1972, that "it is essential that we purchase a relatively uncomplicated instrument." In its second application, filed July 9, 1973, appellant stated:

The model EMU–4C electron microscope is designed for research, is a relatively complex instrument and requires a skilled electron microscopist for its operation. More specifically, the Philips EM201 is a new microscope specifically designed for laboratories

requiring relatively high levels of performance but also simplicity of operation. . . . The overriding consideration for the Philips EM201 is its relative simplicity of design and ease of operation on a daily basis.

In its comments on the second application, the only statement relevant to the foregoing made by NIH's Florence Agreement Committee was:

The ETEM 101 made by Elektros, Inc. is simple and easy to use.

In its third and final application, filed February 20, 1974, appellant pointed out that at an "unknown date in early 1973" the Elektros ETEM 101 was introduced, but that it was not available at the time the Philips EM 201 was purchased on August 17, 1972. Attached to the application was a copy of the manufacturer's description of the Philips EM 201, which includes the following statements:

For the first time, users with a minimum of experience in electron microscopy can be assured of achieving highest quality results, quickly and easily. This new instrument is designed to combine maximum simplicity of operation with high performance.

The comments on the third application by NIH's Florence Agreement Committee which provided the basis for the Secretary's finding of scientific equivalency did not again refer to the Elektros ETEM 101. However, the Committee said that "the description of the research or teaching does not establish a pertinent characteristic for the article that upholds duty-free entry."

Regulation 15 CFR 701.2(n) provides that the term "pertinent specifications"—

does not extend to such characteristics as size, durability, complexity, ease of operation, ease of maintenance and versatility, unless the applicant can demonstrate that they are necessary for accomplishing the purposes for which the article is intended to be used.

I am satisfied that the record demonstrates that simplicity and ease of operation are necessary for the purpose of training students in basic principles of electron microscopy. No responsive comment, either by NIH's Florence Agreement Committee or the Secretary (through the Director, Office of Import Programs, Domestic and International Business Administration), appears in the record to refute appellant's claim that the Philips EM 201 possesses these pertinent characteristics and that the EMU–4C does not.[1] Nor is there any evidence of record, much less "substantial evidence," to support the Secretary's finding of scientific equivalency on this point. Accordingly, the Secretary's finding insofar as it relates to the purpose of use of the Philips EM 201 in training students in basic principles of electron microscopy should be reversed and the case remanded for the taking of testimony and/or the production of evidence on the basis of which an appropriate and responsive finding can be made on the relative simplicity and ease of operation of the Philips EM 201 and the EMU–4C.

In its first application, filed October 2, 1972, appellant stated that Forgflo Corporation, which had taken over the EMU series from RCA, was on the verge of bankruptcy and that the EMU series was no longer on the market. Actually Forgflo had filed a petition in bankruptcy in August 1971. In its second application, filed July 9, 1973, appellant stated

that Forgflo was no longer in business pending resolution of the bankruptcy proceedings. In its third and final application, appellant (apparently in response to a comment on Adam David Co. by NIH's Florence Agreement Committee on the second application) stated that Forgflo had gone into bankruptcy and that the Adam David Co., "a company unknown to experts in the field," had stated (in 1973) that it was "manufacturing and selling the EMU–4C microscope." It further stated that, at the time it purchased the Philips EM 201 on August 17, 1972, Forgflo was unable to furnish a guarantee of adequate service. Commenting on this point, NIH's Florence Agreement Committee made the following statement: "Anticipated service needs . . . are not relevant to duty-free entry." The Secretary's decision contained no statement on the point of assured service.

The majority would overcome this reversible deficiency[2] in the Secretary's decision by relying on a letter in the record from the RCA Service Company dated December 10, 1973, fourteen months after appellant filed its first application and sixteen months after the electron microscope in question was purchased. The letter expresses a commitment (as of December 10, 1973) that the Company "will provide service and parts to any individual or organization in the U.S.A. and Hawaii." Although the letter recites lack of knowledge of any in-

1. The Senate report on H.R. 8664, which became the Educational, Scientific and Cultural Materials Importation Act of 1966, establishes an intention that duty-free status be granted a foreign article where a domestic article is merely *not as capable* of fulfilling the purposes for which the foreign article is imported.

    (2) *Equivalency of scientific value*

    .    .    .    .    .

    Under the bill the determination of equivalent scientific value is to be in terms of equivalent scientific value for the purposes for which the instrument or apparatus is intended to be used. This will prevent the bill from resulting in the duty-free entry of an instrument or apparatus in a case where there is available a domestic article which,

though different from the foreign article in some scientific characteristics, nevertheless is as capable as is the foreign one of fulfilling the purposes for which the instrument or apparatus is intended to be used.
S.Rep.No.1678, 89th Cong., 2d Sess. 12 (1966) U.S.Code Cong. & Admin.News, p. 3265. The House report is practically verbatim. H.R. Rep.No.1779, 89th Cong., 2d Sess. 18 (1966).

2. "The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues." *Greater Boston Television Corp. v. F. C. C.*, 143 U.S. App.D.C. 383, 444 F.2d 841, 851, *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

stance where service "has been refused to anyone," it does not show when such service had been rendered in the past and, particularly, whether it was being rendered at the time of appellant's purchase of the electron microscope. Indeed, in its second application, filed July 9, 1973, appellant stated it had been informed that RCA would only "continue to service their instruments on a parts-available basis." Instead of giving "reasoned consideration" to this critical point, the Secretary failed to even comment upon it, apparently relying on NIH's Florence Agreement Committee's erroneous judgment that anticipated service needs are irrelevant.

Item 851.60, headnote 6, directs that the Secretary determine—

whether an instrument or apparatus of equivalent scientific value to such article, for the purposes for which the instrument or apparatus is intended to be used, is being manufactured in the United States.

As pointed out above, the congressional intent was that duty-free status be granted a foreign article where a domestic article is merely *not as capable* of fulfilling the purposes for which the foreign article is imported.[3] It seems self-evident that lack of assurance of service on a $36,000 EMU–4C would indicate that the EMU–4C was not as capable of fulfilling appellant's research and educational purposes as the $43,700 Philips EM 201 with assured service. Therefore, the Secretary's finding of scientific equivalency should be reversed and the case remanded for the taking of testimony and/or the production of evidence on the basis of which an appropriate and responsive finding can be made on the question of whether there was a reasonable assurance of continued service on the EMU–4C at the time appellant purchased the Philips EM 201.[4]

---

**3.** It is noted that Regulation 15 CFR 701.11(b) provides that, in determining whether a U.S. manufacturer is able and willing to produce on order or custom-make an instrument or apparatus, the Deputy Assistant Secretary shall take into account the "normal commercial practices applicable to the production and delivery of instruments, apparatus, or accessories of the same general category." I agree with the majority that assurance of service is not covered by this regulation. However, such a gap in the regulations does not diminish the relevance of assurance of service in finding scientific equivalency under the law, construed to give effect to the congressional intent.

**4.** Appellant cites approval on October 21, 1972, of a duty-free application by Purdue University for an EM 201 microscope purchased in 1971; also approval on May 17, 1973, of a similar application by the University of Minnesota. The record with respect to these applications is not before us, so they cannot be regarded as precedents. However, following remand, the Secretary might wish to take them into consideration or comment on them for their bearing on the point of uniform treatment of applications.